The next case on is for argument is United States v. Schlegel, or United States v. Hatfield. Good morning. May it please the court, my opponents. I've reserved three minutes for rebuttal this morning, but I thought I would begin in this extremely unorthodox case in an unorthodox way by reading a line from the prosecution's brief. Prejudice exists where an error or defect in the grand jury proceedings substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision was free from the substantial influence of such violations. That's at pages 71 and 72 of the government's brief. It's a citation to the Bank of Nova Scotia case. In this case, the prejudice to the S-2 grand jury of the return of a non-indictment by a non-grand jury which purported to return the S-1 indictment is quite evident in the record in that the S-2 indictment as to my client is identical to the S-1 indictment, which was not an indictment at all, of course. I'm just having trouble understanding. The S-2 indictment was returned by a validly sitting grand jury. Correct. Is there any reason to imagine that the grand jury that returned the S-2 indictment even knew there was an S-1 indictment? Yes. Let alone there was an invalid S-1 indictment? Well, I don't think they knew there was an invalid S-1 indictment, but Federal Rule of Criminal Procedure 6E3C permits a U.S. attorney to disclose to a grand jury what that person believes to be grand jury material. As a former assistant U.S. attorney, I'm quite confident that what happened, and we don't know because we never got the hearing we asked for, I'm quite confident that what happened in the S-2 grand jury is that the S-2 grand jury was presented with the fact of the return of the S-1 non-indictment. Why would you say that?  I mean, what they were presented with is all of the testimony that had been recorded that was presented to the earlier grand jury. I don't know exactly what happened because we never got the hearing that we requested in the district court. Why would you imagine, what is the reason to think that there is any irregularity in the S-2 grand jury? Because its indictment is identical. Except for one thing, there's a new defendant. Exactly correct. Isn't that a good purpose to have a superseding indictment? In this case, it's a weird fact because that defendant was set to plead guilty. And in the typical case, the procedure would be to file an information and allow that defendant to plead guilty to an information. That has to be waived. Yes, and I believe that defendant was ready to waive it. What would be improper about, even if it is identical, why would it be, the whole problem is the S-1 indictment is invalid. So now the prosecutor, if the prosecutor wants to have those charges brought, has to present them to a new grand jury. Right. And did that new grand jury actually consider the charges or did it simply see a pile of transcript and rubber stamp what happened in the first non-grand jury? We don't know. You're saying that there is a reason to believe that the prosecutor went to the second grand jury and said, I've got a bunch of stuff. Another grand jury already voted this. Just give me a vote. Because the other grand jury had done it. Rather than doing what the typical appropriate procedure is and having the testimony re-read to a new grand jury. We have no idea what happened. You have no idea. In any case in which a grand jury returns an indictment, you have no idea what actually happened in front of the grand jury. In order to show there's some irregularity, there has to be something to suggest that there is an irregularity. Yes, and there is in this case in that there are allegations in the S-2 indictment that make no sense. There's reference to property that had long since been seized and did no longer belong to the defendants. Can I just ask you this? Is there any reason to believe that the U.S. Attorney's Office knew of the defect in the S-1 indictment before two years after the trial when this was discovered? I do not believe there is. I believe them. I take them at their word that they had no more idea than I did that there was this defect in the S-1 indictment. I take them at their word at that. The only countervailing fact, which I think does not in any way weigh against that inference ultimately, is that it was strange to put a pleading defendant into the S-2 indictment. If you wanted to be a crazy conspiracy theorist, you could say that they did that because they realized the S-1 indictment was bad. How soon did the additional defendant plead after the return of the S-2? Within days. And she was an out-of-town defendant. She lived in Tennessee, so there was some time to get her up here and that kind of thing. The additional prejudice, of course, to my client from the S-1 indictment derives from the two years almost that her case was pending. What prejudice precisely did she suffer as a result of the two-year delay? Did a witness die? A witness did not die. However, what did die was the corporation that was paying for her and was required to indemnify her in this enormously difficult and complex case. And as a result, her counsel was unpaid for a period of more than six months during the trial. The company declared bankruptcy after the trial began, and that caused a terrible difficulty to counsel. There was an enormous expansion of the charges in the S-1 indictment as to her. That's another very significant prejudice to her. We don't know, because we don't know what the instructions were to the S-2 grand jury, exactly what they were told about the S-1. That's not a function of the time. No, that's just an additional. We're off there. Besides time, the corporation went under and counsel wasn't paid, but ultimately was paid and she was provided a defense. She was. With counsel that she started with? Yes. All right. We hung in there. Good. Anything else? No, it's primarily the financial difficulty that she suffered, and the Taylor case is some precedent for finding that sufficient prejudice to justify the dismissal of an indictment post-trial. Are there any other questions? If not- You've reserved three minutes for rebuttal. I have, I have. Thank you. Is it reappell? Reappell, yes. Reappell. Thank you. May it please the court. My name is Chris Caffrone. I represent the United States on this appeal. The first item I wanted to address was the prejudice question, as Ms. Hatfield acknowledges the only prejudice she alleges is a financial inability to defend herself, which falls flat here because Ms. Hatfield had the counsel of her choice, two extremely skilled defense attorneys that represented her before the indictment, represented her through the trial, and continue to represent her today. But at some point, one of the corporations stopped paying for the defense costs during this time, right? That's correct, Your Honor. And at that point, according to the company's restitution claims, they had paid Mr. Reappell and Mr. Surcars over $3 million that came from DHB, the company. In addition, during the trial, the government voluntarily unrestrained $750,000 from money that had been earmarked for the victims and provided it to Mr. Surcars and Reappell during the trial. In addition, after the trial, prior to or around the time of the forfeiture proceedings, the district court transferred Mr. Surcars and Reappell to the CJA panel so that they could be paid through the CJA funds. So throughout the course of the representation, they were paid and they did a tremendous job representing Ms. Hatfield throughout. They even got an acquittal on two of the counts that were charged in the indictment. But the focus when you're dealing with prejudice too. The other thing I wanted to point out with respect to the costs for Ms. Hatfield during the prosecution, there were concessions made. Ms. Hatfield was not required to travel to status conferences. She was appearing by phone. In addition to that, the government permitted her to take a mortgage on a condominium that was paid for with DHB money. She got, I think, over $150,000 which she was able to use to cover living expenses. In this day and age, the electronic age, she certainly was able to prepare her defense by having phone calls, email communications with Mr. Reappell and Surcars. In addition to that $150,000 plus that she got from a mortgage on the condo, I believe she also sold that condominium and was able to use some of those proceeds to live. There was also, I think, $700,000 plus that was withdrawn from an account of which $400,000 supposedly went to pay her taxes. The other $300,000 was unaccounted for. Could I go back to the defect in the S1 indictment? Mr. Reappell apparently concedes that he has no reason to think the government knew of that defect. But at the same time, he makes the point that the S2 indictment is returned and apparently does nothing much to change the indictment the way a pretrial superseding indictment might to change the charges to shape it up for trial. It adds a defendant who was about to plead guilty and who immediately drops out. And I'm a little puzzled as to why he's bringing that up if he doesn't think that there's some mystery about the S2 indictment that can only be explained by the idea that the government knew it needed to have a real indictment because there's a problem with the first one. So do you have any response to that? What is the basis, why is there an S2 indictment? And is it the case that the government had no clue that a grand jury had expired? None of the grand jurors said, excuse me, I've been here for 18 months and now you're calling me back? And I thought I was done? Just to address the last question, we'll start with that. The government didn't know that the S1 indictment was not properly impaneled at the time that it returned that first indictment. And it's illogical to think that the government would have known that and waited the amount of time that it waited to return an indictment. Why not just go to a properly impaneled grand jury? So that argument doesn't really, it's not logical. I'm going to fix it right away if you knew there was a- Correct. If it had known, that's exactly what it would have done. With respect to Ms. Lennox, who was added, Ms. Lennox was Ms. Hatfield's sister. She was scheduled to plead guilty pursuant to a cooperation agreement, and then she decided, declined to do that, decided she did not want to do that. I don't actually have the docket with me. I have Ms. Hatfield's docket. I don't recall the timing of her guilty plea. I don't know if it was within days. What you're saying is there was a deal for her to waive indictment and it broke down. And then it broke down, and then we had to make a decision as to what to do with her. So we indicted her. We added her to the S2 indictment. And that was the reason why we had a returned indictment on S2. And so what you have here is just pure speculation as to any kind of government misconduct. It's purely unfounded. And the district court, who was best positioned to have her presided over the case for seven years, having sat through an eight month trial, held there were no allegations, let alone concrete allegations of misconduct. They were unsubstantiated. They were fantastical, her words, and I think that- I thought in the brief there was, today Mr. Riopelle emphasized the financial prejudice. But I thought in the brief there was an argument that Ms. Hatfield was prejudiced because while she was under indictment the whole time, right? There's already the original underlying indictment has charged her. Mr. Brooks only shows up in the S1. And the showing up of Mr. Brooks in an indictment that turns out to have not validly indicted him leads to a considerable period of delay. Because her case is progressing along and suddenly his case is much bigger and more complicated and more obstreperous in various ways. Isn't that some form of prejudice? I mean, her speedy trial rights change dramatically once Brooks appears. Isn't that a problem if Brooks shouldn't have been there? No, Your Honor, because what I'd argue is Ms. Hatfield, from the initial indictment to S1 there was substantial changes against her as well. She was added, not only did you have a defendant added to the case, her co-conspirator, but she also had an additional two schemes, the tap- But that's all the more problem, because the whole point is this is an invalid indictment. If that escalates her problems as well as escalating Brooks into the case, that's just more trouble that comes from the invalid indictment. But what it does is it serves the essential features of an indictment. It put her on notice that she had to defend against these claims, which the S2 grand jury returned an indictment. So she had an ability to start preparing a defense on these claims. And what I would also point out, while she attempts to claim speedy trial rights, at the same time she's requesting adjournments. She requested an adjournment in December of 2008. In that adjournment request, she said she wasn't prepared for trial. She was reviewing the voluminous discovery. I would also note that during, after the return of S1, there was significant discovery that was provided. And it was provided by DHB. In this case, we didn't do a search warrant. We were getting documents through subpoena. DHB, the company that Ms. Hatfield worked for, had found 12 boxes of documents that they believed came from Ms. Hatfield's office. They found those in, I think it was December of 2008, after the S1 indictment. They were made available to Ms. Hatfield. In addition to that, they found two magnetic tapes containing backups of the server at the DHB corporate headquarters. That were made available to Ms. Hatfield, Mr. Brooks. Before the government was even, they were made available to the government because they had to have privilege review done first. In addition to that, you had a PACA server, which was the subsidiary in Tennessee that was very important to Ms. Hatfield's defense. That was found by DHB. It had approximately 1.7 million documents or pages of documents. So there was a voluminous amount of discovery that Ms. Hatfield was reviewing. In addition to that, that entire time frame, she was making motions. She filed several severance motions. She also joined Mr. Brooks' motions to dismiss several counts in the indictment. She also joined his motion to dismiss the indictment on privilege grounds. She also joins his motion for suppression of evidence on the privilege ground. The motions for severance, the principle basis for the motions for severance was speedy trial, right? She was arguing in those motions that I should be severed from Brooks because this case is taking way too long. Please sever me, right? I think that was one of the grounds. I don't know if it was the primary, but yes, it was certainly one of the grounds. It was present in all the motions to sever. I believe that to be correct. Your position is she had to move to dismiss to be able to assert her speedy trial rights. How is it plausible that someone who keeps losing severance motions on a speedy trial basis is going to get the indictment dismissed on speedy trial grounds, because that's one of your arguments, right? That is, your honor, and that's because the statute requires that 3162A2 requires a formal motion to dismiss. And this court has held that simply asserting in court your speedy trial rights is insufficient as a matter of law. So the law requires her to make that motion to dismiss as futile as it may or may not have been. So it does require- It wouldn't have been futile if the ground was that there's no actual indictment pending. If somebody had looked and found and figured out what somebody figured out many years later, then there would have been- I mean, I thought that was the basis now for saying her speedy trial rights are prejudiced, is not simply the failure to sever or any speedy trial act violation that was known about at the time or argued about at the time, but is based on this discovery after the fact that all, the argument is that all of those continuances were improper because they were based on an invalid indictment. I think that's correct, and what's important about that, too, is that motion to dismiss based on a defect in the proceedings was never raised. It was never raised in any of the severance motions, so clearly that's a waiver that- Nobody noticed that at the time. Correct. That's correct. And if your honors don't have any additional questions, I will rest on our papers. Thank you. Thank you, Mr. Caffaro. Mr. Riopelle. Thank you, Judge. Well, I have several things to dispute there. The first is that collection of $3 million in fees. I didn't hear a record cite to that, and I wish there had been because I would have loved to find that money. We didn't earn anything like that. I'm not claiming we didn't earn a pretty good fee over the five years we represented Ms. Hadfield before the trial began. We represented her in a whole series of civil litigations, all the rest, but boy, I wish I had that $3 million. With respect to our request for adjournment, I do want to remind the court that- Whether it's $3 million or not, the argument from prejudice because of the bankruptcy of DHB is an argument about psychological tension and worry and not minimizing that. Because the fact is, she had counsel, you folks, all the way through, and ultimately you were paid probably less than you would have liked and less than you billed. But there was, it's not just that there was whatever amount was earned earlier, but there was payment in the end. Yes, we got out of there with our skin on by dint of a courageous ruling by the judge on our thoughtful Monsanto motion. And some very serious tail twisting by another judge in that district when the government refused to pay us anything after the granting of the Monsanto motion, the judge ordered us next door to arbitrate it before a judge who browbeat the government into a sense of reasonableness, so we survived, we did. So everybody was very unhappy. It was a typical criminal case, it was a typical criminal case, your honor, there was no happy person for miles around, yes, that's correct. With respect to our request for an adjournment, and I do want to say, by the way, I got along swimmingly with Mr. Caffarone and his colleagues during that miserable eight months of trial. I was actually happy to see him this morning, for what that's worth. I think we all got along pretty well as we made our way through a miserable experience for all. Yeah, but you are saying that they engaged in deceit, falsehood, countenancing and covering up an improper indictment for a consulted period of time. No, no, no, I said I take them at their word that they didn't know. I said that this morning. I take them at their word that they did not know that grand jury had expired. The only countervailing fact is- But then I'm having trouble understanding what is, I understand the argument from prejudice financially, that I get. But in terms of what's wrong with the S2 indictment. That's why we asked for a hearing. What was that S2 grand jury told? Were they told that the S1 indictment was a valid indictment? Mr. Riopelle, you mentioned you were a former US attorney. I think everybody sitting here, except for Judge Droney, who was only a US attorney, are former US attorneys and or US attorneys. Right. I mean, and we all have been through this process, I think, I suspect, of representing a case to a second grand jury because the first grand jury has expired and you've gotten your six months extension and you can't get it done in that time. What is unusual about this? Where's the smell here that says, which I think under our jurisprudence and certainly Supreme Court jurisprudence, you've got to show in order to open up what happened in a grand jury. Well, the smell is that there's no difference between the S1 and the S2 indictments. And that leads to an inference that the S2 grand jury was presented with transcripts, told they could review them, take your time. Do you have any reason to believe that Lennox got cold feet about cooperating? And they said, well, we've got to indict her then, because the cooperation agreement's gone. We were going to file an information against her, but we can't take any chances. We've got to indict her. Is there any reason to disbelieve the US Attorney's Office? I take Chris at his word on that. I don't, as I stand here, recall exactly what those facts were back in 2009. Then I'm still puzzled whether it's because they needed to indict Lennox or because for whatever other reason they went before the grand jury. Why would they do it improperly? What I want to know is, what was the S2 grand jury told? Were they told that the S1 indictment was invalid? Were they told that the S- Any time the government goes back and gets a second indictment from a different grand jury, there's the same problem. Maybe the prosecutor didn't represent anything. Maybe the prosecutor told them, don't worry about this. It's all been done by somebody once before. All you have to do is rubber stamp it. Maybe, maybe, maybe, but that's not unique to this case. Yes, but what is unique to this case, and this is truly a Rara Avis, is that the prior indictment was not an indictment at all. It was not returned by a valid grand jury. It appears that nobody understood that fact. And so, yes, that subsequent grand jury can rely on hearsay, but it has to be properly instructed as to the hearsay. What were they told? That's why we asked for a hearing. Let's find out what happened there. Let's see what's in those transcripts, because if they were told this is a valid indictment returned by the S-1 grand jury, here are the transcripts. You have the right to review them entirely if you wish to. They're this tall. And the S-2 indictment was returned ten minutes later. Then I think I have a fair argument to make that no grand, no grand jury fairly considered the wildly expanded charges that were first brought against Mrs. Hatfield in the S-1 indictment and were regurgitated verbatim in the S-2. Yes, Judge, I'm sorry to interrupt. I think somewhere I read, and maybe it was your brief, that there was no Janks Act material that was attributable to that second grand. Actually, the third grand jury in this case was all S-1 Janks Act material. Is that right? That is exactly correct, Your Honor. There is no evidence that a witness testified in the S-2 grand jury. It's that a witness who was called in the trial testified at the grand jury. Correct, correct. You and I and everybody here on this little group that's around here knows that you can have a case agent who is not called as a witness go in and read there until his heart's or her heart's content until the grand jury says stop, we've heard enough, right? Yes, and let's find out if that happened. Let's find out if that happened, or did he come in and say, these are the transcripts from the first grand jury, and was the grand jury, the S-2 grand jury, invited to review them? You haven't cited us to any case in which, at least in this circuit, that has been allowed, right? No, I have not. Thank you. Thank you, Judge. Thank you for, no, thank you for your great arguments. I mean, much appreciated, both of you. Yeah, this is one of the- Why'd you two got a chance to see each other? Really? We, I specialize in the strange and unusual. Thank you, Judge. All right, we'll reserve decision.